STRINE, Chief Justice, dissenting: With regret, I respectfully dissent from the well-stated decision of my colleagues, which affirms a thoughtful'decision of the Court of Chancery. I do so because I find that the facts pled raise a pleading, stage inference that it was the business strategy of Duke Energy, accepted and supported by its board of directors, to run the company in a manner that purposely skirted, and in many ways consciously violated, important environmental laws. Being skilled at running an energy company whose conduct presented " environmental hazards, but whose operations provided an important source of employment, Duke’s executives, advisors, and directors used all the tools in their large box to cause Duke to flout its environmental responsibilities, therefore reduce its costs of operations, and by that means, increase its profitability. This, fiduciaries of a Delaware corporation, may not do.[107] My primary disagreement with my friends in the majority and the Court of Chancery involves the application of the procedural posture to the facts as pled. Even though' we are in' a context when particularized pleading is required, that does not mean that the plaintiffs must have conclusive proof of all their contentions. Instead, they must plead particularized facts that support a rational'inference of non-exculpated breaches of fiduciary duty by a majority of the Duke Energy board.[108]. Rarely will such evidence involve admissions by experienced managers and board advisors that-the strategy they are undertaking involves a conscious decision to violate the laws, against the backdrop of a regulatory environment heavily influenced by the company’s own lobbying and political contributions. • ■ Unlike the majority and the Court of Chancery, I do not believe that the plaintiffs have to prove at this stage that there was collusion between a weak local regulator and Duke to avoid more searching scrutiny of its practices that pose a risk to the environment, wildlife, and public health. What they have to do is plead facts supporting an inference that Duke consciously was violating the law, taking steps that it knew were not sufficient to come into good faith compliance, but which it believed would-be given a blessing by a regulatory agency whose fidelity to the law, the environment, and. public health, seemed to be outweighed by its desire to be seen as protecting Duke and the jobs it creates. The pled facts that support this inference at this stage include: • Duke’s board knew that Duke illegally discharged highly toxic water from its coal ash ponds into the groundwater, sometimes intentionally through manmade channels,[109] in violation of both state and federal environmental law.[110] Duke’s 760 daily violations of environmental regulations dated back to at least January 2012: the earliest time period from which the state regulator could assess liability under the statute of limitations.[111] • Duke knew its coal ash ponds were contaminating groundwater at illegal levels,[112] as confirmed by testing dating back to at least 2007 conducted by Duke itself, regulators, and environmental groups.[113] • Duke’s board knew that Duke had to procure discharge permits for its many coal ash ponds, but continued to operate them illegally and, in some cases, without any permit at all, in violation of state law and the Clean Water Act, even after trying, but failing, to secure a less restrictive type of permit.[114] • Duke and its affiliated donors spent over $1.4 million dollars to influence its home state political process to secure the election of officials who would be lax in their enforcement of federal and state environmental laws that applied to Duke’s operations,[115] including a Governor who had been a Duke employee for twenty-eight years.[116] • Duke’s board was aware of and supported the 'strategy to enlist the state regulator, which had done little to cause Duke to come into compli-anee with law in the past and which was now overseen by the Governor who had been a Duke employee for twenty-eight years and was supported by Duke in his campaign, to file complaints against Duke and thereby preempt the citizen suits that sought substantial, remediation.[117] The .regulator then proposed a consent order that involved a trifle of a civil penalty and that did not require remediation or a change in Duke’s coal ash storage practices.[118] • Four days after being court-ordered to immediately eliminate all sources of contamination from its coal ash ponds, Duke “was caught illegally and deliberately dumping toxic coal ash wastewater into the .Cape Fear River, a practice that had been ongoing for several months and which resulted in 61 million gallons of wastewater discharged in the river.” [119] Confronted with aerial photographs of this illegal activity, a Duke spokesman attributed the pumping to routine maintenance — an assertion rejected by DEQ because the pumping activity “far exceeded what would reasonably be considered routine maintenance.”[120] As can be seen, in one respect, I share a key assumption with my colleagues in the majority. I do not rest my dissent on the notion that the board of Duke, under the pled facts, was ignorant of the company’s practices. Sadly, my dissent rests on my reluctant conclusion that the facts as pled support a fair inference that-the board was all too aware that Duke’s business strategy involved flouting important laws, while employing a strategy of political influence-seeking and cajolement to reduce the risk that the company would be called to fair account.[121] Under the facts as pled, the only surprising thing about the Dan River spill that gave rise to. the state regulator’s issuance of a $6.8 million fine, twenty-three Notice of -Violation letters, twenty-six Notice of Deficiency letters, and a finding that Duke committed more than 760 daily violations of environmental regulations, in addition to other severe civil and criminal penalties related to Duke’s operations at other sites, is that something like it did not happen years earlier.[122] And the fact that the local regulator that had'been so compliant and cooperative in shaping easy conditions for Duke that the plaintiffs from the environmental community Duke sought to avoid would not have accepted, so rapidly turned tail and ran in the face of public sentiment supports, rather than, contradicts, the complaint’s allegation that Duke knew it was dealing with a regulator that was not focused on its legal duties. When the deal they cut was put under the spotlight of public scrutiny, its friendly regulator abandoned it, consistent with the behavior one would expect of a regulator that did not, let’s say, run straight. The company then experienced the predictable: the serious financial and reputational consequences that come when an offender is caught out, and those complicit in turning a blind eye to the past misbehavior tries to distance itself from responsibility by slapping its old buddy hard. It may be that after the daylight of discovery shines for some time, the rancid whiff that arises from the pled facts dissipates and turns into the bracing freshness of a new Carolina day. But, without that, the off-putting odor will linger and so too will rational suspicions that the defendants caused the smell. . See, e.g., In re Massey Energy Co., C.A. No. 5430-VCS, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011) (gathering sources for the proposition that "Delaware law does not charter law breakers. Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue 'lawful business' by 'lawful acts.’ As a result, a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law.”); see also 8 Del. C. § 101(b) ("A corporation may be incorporated or organized under this .chapter to conduct or promote any lawful business or purposes ..,.”); 8 Del. C. § 102(a)(3) ("It shall be sufficient to state .,. that the purpose of the corporation 'is to engage in any lawful áct or activity for which'corporations may be organized ... and by such statement all lawful acts and activities shall be within the purposes of the corporation ,,,, ”)). . E.g., In re Cornerstone Therapeutics Inc., 115 A.3d 1173, 1175-76 (Del. 2015). . App. to Opening Br. at 74-75 (Am. Compl. 38-39) (alleging that “Officer Defendant Keith Trent ... in a presentation to Duke’s Board of Directors on August 27, 2013,” including seventeen of the defendants, "explained that ‘seepage’ was a ‘necessary’ aspect of the Company’s ash ponds because the release of contaminated water was needed to "manage[] water'pressure”); id. at 76-77 (Am. Compl. 40-41) (SELC identified instances of illegal' seeps at the Riverbend Steam Station, and "[i]n some instances, Duke had even constructed so-called French drain structures to facilitate the flow of this contaminated water out of the coal ash ponds and into surrounding lakes and rivers. SELC tested some of this contaminated water and .found it contained arsenic at twice the allowed level, cobalt at 52 times the allowed level, manganese at 128 times the allowed level and iron at 27 times the allowed level.”); id. at 103-04 (Am. Compl. 67-68) (alleging that fourteen of the director defendants "knew that the Riverbend facility was literally flooding polluted coal ash water into North Carolina waterways at a rate of 4.9 million gallons per day” and that the director defendants "were told that the DEQ settlement [for Riverbend and Asheville] would only impose a $99,000 fine to help ‘reinforce[ ]’ the fagade of a ‘diligent prosecution’ by DEQ, thereby preventing environmental groups from suing Duke to enforce the law”). . Id. at 91 (Am. Compl. 55) (Jeff Lyash, Executive Vice President, Energy Supply, explained at a meeting of the Regulatory Policy and Operations Committee "that the Company was violating state and federal laws by making unauthorized discharges of pollution into groundwater” and that by December 2012, after a presentation from the RPOC, twelve of the fifteen director defendants and three of the former director defendants "knew that: (i) Duke was in violation of the Clean Water Act and North Carolina state law; (ii) Duke’s violations posed enormous threats to the Company, the environment and the health of North Carolina citizens; and (iii) ‘third-party litigation’ could bring the situation to a head by prosecuting Duke for its violations.”). . Id. at 110 (Am. Compl. 74). . Id. at 269 (Keith Trent, Environmental Review, Aug. 27, 2013, at 7) ("Groundwater (GW) monitoring has been conducted since 2007 or before with results submitted to state agencies; exceedances of certain GW standards at all ash ponds ... Exceedances at most sites are for' secondary (non health-based) standards; exceedances at some sites include primary (health-based) standards”); id. at 103-04 (Am. Compl. 67-68) (alleging that this presentation to the board "is direct evidence that these Director Defendants knew that Duke’s earthen coal ash ponds were discharging polluted coal ash water in violation of the Clean Water Act”). • . Id. at 75-79 (Am. Compl. 39-43) (describing Duke's finding in 2007 of exceedances at all of its ash ponds; state reports in 2009 and 2012 of exceedances at 13 and all 14 of Duke's active coal plants, respectively, in North Carolina; a county report in'2010 of exceedances of arsenic and zinc in Mountain Island Lake, Charlotte’s main source of drinking water, near Duke’s Riverbend facility; the 2013 reports of two environmental groups that Duke’s ash ponds were illegally discharging contaminated water at a rate of 5 gallons per second, sometimes facilitated by drain structures Duke constructed; reports of contaminated groundwater at Duke’s Dan River Station between 2011 and 2013, and at Duke’s Asheville plant between 2010- and 2012; and DEQ’s disclosure of the existence of violations at 14 Duke facilities). . Id. at 89-90 (Am. Compl. 53-54) (summarizing articles from the New York Times and the Charlotte Observer reporting, based on internal DEQ emails, that "regulators knew as early as 2009 that power plants were operating without stormwater permits”; that "George Everett, Duke’s director of environmental and legislative affairs, met with regulators to discuss the issue in 2011 and-2012” seeking a general landfill permit for its coal ash ponds, a less stringent permit, because it was not subject to the same extended comment period as stormwater permits; and that “[a]s a result of Duke’s improper influence with DEQ, the issue was permitted to remain unresolved’’); id. at 132 (Am. Compl. 96) (alleging that by as early as 2011, nine of the defendants "utterly failed to implement a system to insure that the Company -applied for proper permits for Duke’s coal plants, let alone complied with the operational requirements governed by those permits”). . Id. at 94-97 (Am. Compl. 58-61) (alleging •that new Governor Pat McCrory put in place policies to ease environmental regulation and appointed Duke employees to key posts, including the Commerce Secretary) (citing Michael Biesecker & Mitch Weiss, The Big Story: NC Regulators Shielded'Duke’s Coal Ash Pollution, Associated Press, Feb. 9, 2014, http;// bigstory. ap. org/article/nc-regulators-shielded-dukes-coal-ash-pollution' (quoting Amy Adams, former DEQ regional director who resigned in protest in November 2013 as observing: "Under the new administration, North Carolina has changed the definition of who its customer is from the public and natural resources it is supposed to protect to the industries it regulates. There’s been a huge push away from environmental protection toward promoting economic growth.”)). . Id. . Id. at 97-98 (Am. Compl. 61—62) (alleging that "[t]he purpose of DEQ’s suits was to permit Duke to continue to do business as usual and to block SELC from enforcing the Clean Water Act and requiring Duke to clean up its ash ponds. As reflected in Duke’s Board materials, the Director Defendants were kept apprised every step of the way on how Duke was colluding with DEQ to abuse the protections afforded citizens under the Clean Water Act and to shield Duke from the consequences of its violations of the Clean Water Act.’’) (emphasis omitted). . Id. at 105 (Am. Compl. 69) (quoting the Chief of the EPA’s Clean .Water Enforcement Branch as stating to DEQ that “[t]he consent order’s, proposed penalty amounts for past violations ... seems low considering the number of years these facilities are alleged to have been out of compliance). Compare id. at 244 (Lloyd Yates et al., Regulated Utilities Update, May 1, 2013, at 13) ("NC has initiated enforcement action against Asheville, which ordinarily deprives environmental groups of right to sue ... We will be working with NC to resolve Asheville and hopefully address other plants at the same time. We do expect a civil penalty and compliance schedule of tasks, all of which constitute ‘diligent prosecution’ arid bar the environmental groups' citizen suit.’’) and id. at” 270 (Keith Trent, Environmental Review, Aug. 27, 2013, at 7) (“Following judicial approval, consent decree would resolve state enforcement litigation against Asheville and Riverbend .... $99K civil penalties for violations as of July 15, 2013 (reinforces diligent prosecution) .... Compliance schedule for further delineation’’) with id. at 100 (Am. Compl. 64) (noting that the proposed consent order assessed a $99,000 fine, $60,200 of which was for coal ash pollution at the Asheville site, but “did riot include a mandate that the Company clean up the pollution or a requirement that the Company change how it stored toxic substances”). . Id. at 134 (Am. Compl. 98). . Id. at 79-80 (Am. Compl. 43-44). . My colleagues in the majority and I have a good faith disagreement about whether the board’s knowledge, as pled in the complaint, is exculpatory under Caremark, their considered view, or in my view, whether that knowledge can and thus must be viewed -with more suspicion. The complaint makes particularized allegations that it was a matter of public discussion for many -years that Duke walked the line environmentally, that the Duke board knew that was the case and supported continuing that policy, and that the company engaged in extensive efforts to influence the political process to allow the company to escape the need to clean up its act. To my mind, on a motion to dismiss, the plaintiff is entitled to have rational inferences drawn in its favor, and I think it is at least rational to infer from these particularized facts that the Duke- directors understood the company’s policy was to skirt the.environmental laws in pursuit of profits and to hope that they could get away with it by influencing regulators to ignore its non-compliance. . Id. at 108-123 (Am. Compl. 72-87).